You may be seated. Our first case of the afternoon, Pedigo v. Stewart Title Guaranty, for the appellant, Mr. Young, for the athlete, Mr. Tinney. You may proceed. Good afternoon. May it please the court, Mr. Tinney. The plaintiffs in this action have brought an action on a contract ensuring title to the property, a very unique piece of property that they bought. Approximately a 60-acre parcel of property which extends, had a portion of it which extended down into the Lake Springfield and included some lakeshore property along Lake Springfield. And actually the property extended into the lake to the center of Lake Creek. Now, to dispel a couple of things which are not before the court, you know, there were some suggestions about the adequacy of notice and the claims and those things filed in there. But I think we need to do away with those because while there were some affirmative defenses raised, the trial court found that there was no prejudice, that the defendant had proved no prejudice and there's no cross-appeal here. And under paragraph three of the contract of insurance, there's a specific provision that says the failure to notify the company shall in no case prejudice the rights of any insured under this policy unless the company shall be prejudiced by the failure and then only to the extent of the prejudice. So that leaves us within the four corners of the policy because the defendant in this case never did anything. Under the policy, they had a first duty to either defend or to prosecute to preserve the insurance rights under the policy of insurance. They admittedly did nothing, initially denied the claim, later on admitted they had insured the property, but then implied that they had, quote, other defenses but did nothing further. It's our position, and the two thresholds and primary issues before the court are the interpretation of the contract. It's our position that under paragraph six of the contract, that having failed to defend or having failed to prosecute or take any action to preserve and protect the insured's property as insured under the contract of insurance, they necessarily found themselves under paragraph six, which says they have essentially three separate options to act under the policy, which to settle and terminate their claims. The first of which is simply to pay the policy to the insured. They could have done that. The second two options that they had was, one, go to the third parties, the claimants, the encroachers, those that were seeking to take the insured land away from the insureds and to settle with them. They did no such thing. They made no efforts to do such thing. And the third option they had was to attempt to settle with the insureds themselves, which they did not do. Having not done any of those, it's our position initially as a threshold question and policies of insurance are to be construed against the insurer, essentially contracts of adhesion, that under those circumstances, having done nothing, they owed an obligation to the insured at the moment of loss to just write a check for the amount of $160,000, which was the amount of the loss, you know, under paragraph six. But assuming then, for the second issue, to go and say that somehow or another they are entitled to actually address the issue of what the actual loss was in this case, the measure of damages is also spelled out in the contract. And we move to paragraph seven of the contract there where it is very specific that the measure of damages requires that the whole be valued, including that which was eventually taken away, the defect or the lost property, and then evaluation done with the defect or encumbrance in place. And then the difference between that is what the loss of the property or the damages under the contract are. In this specific case, the property had included a 50-foot railroad, abandoned railroad right of way, which connected the larger tract of land to the Lake Springfield. And when the Department of Natural Resources intervened and claimed the property and took this property away from the defendants, which had been insured, they lost access basically to the Lake Springfield. The 54.66 wide right of way from the main parcel to the dominant parcel through this right of way, which would have been a subservient parcel to the lake, was reduced from 54.66 feet to 4.66 feet and basically making access to the water just for any purpose other than perhaps a pathway or walk a loss. Mr. Pettigo, one of the owners, one of the plaintiffs, testified that he could find no appraiser, that the land was so unique he could find no one to actually make an appraisal, but as a landowner he made his own appraisal. When they bought this property, he was very clear. They didn't buy it because they wanted to plant turnips or corn or anything else on this right of way. It was to have access to the Lake Springfield and to provide access to potential future lot owners of the dominant parcel, which was approximately 60 acres, which was expected to be subdivided in the future. His testimony was that each of the lot owners would pay a lot of money to have access to the lake. And I think we've cited some cases where our Supreme Court has basically said as a matter of law, having access to public bodies and waterways for entertainment purposes and those things have a value as a matter of law. In this situation, he said even if we only charge a lot owner $1,000 a lot, which is minuscule compared to what he thought it could actually be, the damages would exceed the policy because they had 200 lots planned and if it was $1,000 a lot, it would be a $200,000 loss by loss of the access to the lake. The defendant's appraiser obviously, I think, misunderstood his assignment. He never did make an actual calculation under the contract, but during his direct examination, he came up with this notion of a quote, contributory value. And basically, if you read his testimony carefully, all he was saying was if there was an acre of land there, this is just farmland, you can just evaluate on a per acre basis and when you take one acre away, that's what your loss was. There was no regard, although he did acknowledge at one point that access to the lake would have some value, but there was no regard to the fact that all of the dominant estate would be deprived of access to the lake and the valuable rights that are associated with that. Ultimately, he also acknowledged that a lake lot itself, around Lake Springfield, which are leased lots except for this piece of property, which was unique because ownership was vested, but those lots had values around $200,000, he acknowledged. So even if you flip this whole case on its head and say, well, if there's a $200,000... Why couldn't you find a realtor or an appraiser, an expert to testify to this? Well, he's a landowner, he testified, which he's allowed to, but he said he found, he could find no professional. His testimony was he could find no professional that says, I can't compare to this. We're asking this court to give no deference to the trial court. The trial court makes credibility findings, and we're really not in a position to challenge those credibility findings, are we, as a reviewing court? Well, no, I mean, the trial court is, but the defendant's testimony, his appraisal, is inherently incredible. He said it was farmland. I mean, if you own a piece of property on the beach and somebody put up a fence and says, you can no longer go to the beach, I mean, that's got to make a horrendous difference in the market value of a piece of property. And that's essentially what happened here. For him to just dismiss it, and to be so dismissive and say, well, it's just farmland, and that's all it's good for, and therefore we're going to value it on farmland purposes, is just inherently ridiculous. So, why did the trial judge buy it, then, if it's that preposterous? I don't know. I think I submit that he erred. I mean, we focused first on saying that the policy itself said they owed $160,000, because under the terms of their own policy, why should we even reach that issue? But he did reach that, and I don't want to lose sight of that, because our first position is that the… Well, paragraph 7 of the policy states the policy is a contract of indemnity against actual monetary loss. Correct, if you reach that. Well, I mean, that's part of the contract. No, our position is that you have to start out with paragraph 4, which says we have a duty to go out and prosecute or defend. And having not done that, then they go to the additional remedies provided for in paragraph 6, which say we can pay the policy, or we can go settle with other parties, or we can settle with a landowner. They didn't do any of those things. That brings you, if there's a legitimate reason, then, to get to paragraph 7. That's where the definition is made, is the whole has to be evaluated without the defect, and then the whole with the defect. And Mr. Ryther made no pretense, I think, of even trying to do that. So, even if you accept his testimony saying, well, look, a lake lot could have $200,000 value, and you say, well, if you only have water access to it, that's going to kill it, the land prices, too. So, even the loss of the right-of-way down to a lake lot would be a substantial loss. It would be a loss of… a considerable loss for access to a $200,000 piece of property. Well, was it fair for the trial court to take into account Ryther's testimony that the track was limited by its narrow width at its full width, with the building restrictions along Lake Springfield and that proximity to an active railroad right-of-way? There was no testimony that there were actual restrictions on this land. Did he make reference to restrictions? He just made general restrictions along leased property. This is not leased property. He said the leased property along the lake has the leased restrictions, yes, but not general restrictions which apply to the lakeshore itself. Right. So, given that the access to very valuable rights was lost, it seems to me that the damage is very obviously much, much greater than just farmland, which he says the highest and best use of this land is farmland, which I think is just patently ridiculous in view of the fact that it's… the proximity is so near water, they had access to the water, lakeshore line, where all of the future landowners in this subdivision could be given common rights to access the water, to go down there and put their boats, whatever it is. And, you know, I think, again, the simplest way to review this is that if you own land on a beach and somebody put a fence across it so you could access that land, it just seems to me that that is very obvious that the loss is much, much greater than just the value of the land as a turnip patch or whatever it might be. Well, are there any other properties on Lake Springfield that, instead of having waterfront footage or footage right on the water, have simply access paths from their homes, either leased or owned? There was nothing in the record that I know of. That would be helpful, wouldn't it? I mean, I assume a house on the water, and you own the waterfront in front of you, if that's the way it's set up in Lake Springfield, that has a different value than if your house is back here, but you have access to where you can get down to a dock. Yeah, and I know of no such, you know, and the record didn't contain any reference to any such land. So, and I think also, to address your other question, it's my understanding in reading Mr. Reither's appraisal, he was basically talking about the narrowed, the bottleneck access when he was talking about having such little value. For him to say that because it's 54.66 feet wide, it has minimal value, I think it's just counterintuitive to any sort of reason, logic, and it would be against the manifest way of the evidence in saying, look, you know, because you could obviously build a road down there, and you can see from the maps, and we've reproduced some of those in the appendix where, you know, down at the bottom, the plaintiffs own more land, they own lakeshore, several hundred feet of lakeshore. Obviously, it opens up there, but there's only this one narrow bottleneck where you couldn't take a car through it anymore, you couldn't drive a boat trailer down there, maybe a golf cart, but that's about all you could do. So, it's our position, you know, that the appraisal was not probative of, and not reasonable in any fashion. When he came up with this notion of contributory value, if you read his testimony carefully, I think he started to understand his assignment during his direct examination was trying to make an effort to include this, quote, contributory value as a difference in value. But it turns out, he says, I basically just looked at other land valued on a per acre basis, and that's how I determined what the amount of the damages were, which I think is just patently erroneous in this case. The other three issues obviously are derivative of the first two, whether or not the contract, the insurer had an obligation to pay at the time of the loss, which was back in 1996, you know, the cases we've cited there is just a delay. In this case, not only was there a delay, they never did anything, never lifted a finger to defend, prosecute, or do anything until they were sued on the policy itself, and we submit that that constituted an unreasonable, vexatious delay in payment of the claim in and of itself as a matter of law. So we'd ask that the trial court invoke Section 155, and the penalties and attorney's fees due if they're under it. Fourth was, of course, the attorney's fees issue under the same section. And the last issue we raised was because it was on a written instrument, and the total amount of the policy was due, there should be prejudgment interest due under the interest statute, which allows for 5% interest from the time of the loss. So we'd ask that this court reverse, enter judgment for the amount of the policy, in order that the penalties and attorney's fees be paid, and there'd be prejudgment interest back to the date of loss, which was back to 1996. Thank you. Thank you. Thank you. Please, clerk. Counselor? Having said that, there will be more to say about that relative to the other issues, but at least this construction of the contract is de novo. We recognize that and recognize maybe there's more room for argument than there might be on some of the other issues. And we suggest that the plaintiffs take this paragraph 6 out of context, or in isolation is a better way to say that. They identify in this paragraph 6 three things that the policy allows Stewart Title to do when there's a dispute. Number one, you can settle, you can negotiate with, in this case, the plaintiffs. Negotiate and settle with them. Number two, you can negotiate and settle with the people who are questioning your title. In this instance, the underlying case was with the Department of Natural Resources. And thirdly, if you don't do either of those two, you've got to pass policy limits, period. But that's not, those are not the only options that are provided to the company under the policy. For example, and we advanced a late notice defense, certainly. If the company has a valid late notice defense, the policy says that liability terminates. If the insured does not cooperate, the policy terminates. If the insured doesn't fill out a proof of loss, the policy terminates. I shouldn't say the policy, the liability of the company terminates. The policy also gives the title company the authorization or the option to step in and defend its insured, defend a case, go through trial, come to the appellate court. My point is that there are all kinds of options other than what these three that are set out in paragraph 6. The introductory language in paragraph 6 says that the company shall have the following additional options. So even that language recognizes those aren't the only three things. It would also make no sense to say that those were the only three options we had, particularly here. Because by the time we had written notice as required under the policy, eight months had passed since summary judgment was entered in favor of the Department of Natural Resources and against the plaintiff. So the plaintiffs had lost their 50-foot strip. Eight months later, they tell us about it. That's the basis for the defense we advanced. I forget where I was going with that. You had no knowledge of that until you got the written notice? No knowledge of the lawsuit and the claim or the issue regarding the 50 feet? Mr. Pedigo testified at the trial that on one or two maybe occasions, he spoke in person with the agent who wrote our policy, Mr. Lesniak, here in Springfield. We disputed that. We offered what I thought was substantial evidence to the contrary. And it has been and it still is our position. We didn't know anything about this until May of 1999. The judge, I think, included in his finding that he believed Mr. Pedigo, or at least he found that way. But yeah, we say we did not have any knowledge. Oh, I know where I was going with that. By the time we found out about this, the Department of Natural Resources is gone. We can't settle with them. They won the 50 feet. What's to talk about with them? If you follow the logic that the plaintiffs advanced today and have advanced. This is an argument that was made at the trial court in summary judgments and other aspects of the case. At that point, we only have two options left, right? Because we had paid the policy limits, settled with Mr. Pedigo, or settled with DNR. DNR is gone. So if those are only two options, all Mr. Pedigo and his counterpart plaintiffs, all they have to do is be completely unreasonable with us and not settle. If they effectively prohibit us from settling with them, and the record includes overtures on the part of steward representatives to settle the case. However, Mr. Pedigo, who spoke on behalf of all the plaintiffs uniformly, never gave any indication of any interest in settling. And these are things that are in the record, and we've referred to them generally. But going back to that rationale, we can't settle with DNR. If Mr. Pedigo wants to be completely unreasonable with us, then he makes policy limits the only thing we can do. And that doesn't make any sense. So on this first issue that we've addressed, construction of the contract, we think the trial court's construction of the contract was the correct one, and we think you should affirm that. That being, specifically, paragraph 6 did not delineate our only options. On the subject of the measure of damages, which is the next issue, and the second one that has gained the most attention today, I guess it was the battle of Paul Reither against Danny Pedigo in terms of testimony. Mr. Reither is a certified licensed appraiser. He testified that the difference in value between the whole thing, and I summarized this on page 2 of my brief, he took the whole thing, it was 58.64 acres, and he said that's worth $176,000. And then he says, take out the 50-foot strip, which is almost an acre by square footage, take that out, he says, it's my opinion that it's worth $170,450. He did exactly what the policy says. The measure of damage is the indemnity portion of the policy. Our obligation is to pay you the difference between what it was worth had there not been this defect, and what it's worth given the defect. That's exactly what he did. With the strip, it's $176,000. Without it, it's $170,450. And on that basis, Judd Zappa awarded damages of $5,550 for the loss of the real estate, for the defect. Now, in looking at this issue... On page 3 of the reply brief, let's see in the second paragraph, it's argued, when pressed on cross, he, being the expert, asserted that the loss of the 50-foot right-of-way between the land and the lake did not damage the remainder. That conclusion is patently ludicrous. What's your response? I believe it was his testimony, as included in his written appraisal report, that there was a loss of value, but no more so attributable to access than had it been in the other part of the property. I mean, that was his opinion. That was what the court had to evaluate. The credibility of Mr. Ryder versus the credibility of Mr. Pettigrew. Judd Zappa heard all that cross-examination. And keep in mind, the flip side of this issue is Mr. Pettigrew's testimony. Because the court made an express finding that Mr. Pettigrew's testimony was not credible. Mr. Pettigrew admitted in cross-examination that he made no attempt to arrive at an opinion of the value of the whole property, that is, with the 50-foot strip, nor did he make an attempt to arrive at the value of that whole property without the 50-foot strip. That's the measure in the policy, and he didn't even make that attempt. His testimony was, I think the value of this loss is going to be anywhere between $1,000 and $20,000 per lot, theoretical subdivision lot. Had it been developed and there were 200 lots, people would have paid me anywhere between $1,000 and $20,000 more for their lots. Judge Zappa found that not to be credible. His exact words I don't remember, but when we were arguing over whether that testimony was even admissible, he said, I might as well arrive at an opinion if it's that vague, $1,000 to $20,000. One other thing, on the $1,000 to $20,000 testimony, Mr. Pettigrew acknowledged in his testimony that that was, quote, just speculation, close quote, on his part. So, you have Judge Zappa, who is evaluating the testimony of Mr. Ryder, having heard cross-examination, that is, and everything else that might be said about Mr. Ryder's method, but he's got to evaluate that against what? Mr. Pettigrew's testimony he found to be not credible. He didn't say not as credible. His judgment order says, I find Mr. Ryder's testimony to be credible and Mr. Pettigrew's testimony to be not credible. And here's the thought. What if he threw out Paul Ryder's testimony? What if this court found that Mr. Ryder's testimony was not worthy of any consideration or reliance by the trial court? What is left? Because Mr. Pettigrew's testimony is not credible. Then there's no credible evidence of any kind. And I know we didn't cross-appeal. That's a theoretical sort of thing, but the court at the trial level made a determination of credibility not to be disturbed unless it was against the manifest way of the evidence. He was subject to cross-examination. Judge Zappa did what he did. Standard of review is also significant on these last – I say there's only two issues. Section 155 is the bad faith insurance argument. They break it down into two parts, penalties and attorney's fees. But if you're successful on Section 155, you get both, I guess, penalties and attorney's fees. But the standard of review is abuse of discretion. The trial court's determination as to whether or not somebody's entitled to Section 155 awards is an abuse of discretion standard, which is the most stringent, as I understand things. We had a decent, we had a plausible, bona fide late notice defense. We got written notice, which is required by the policy, eight months after summary judgment. We relied on that. The judge determined that there was notice to Mr. Lesniak, so we did not win that defense. If we had won the defense, we presumably would not have been required to pay anything. Our liability would have terminated. We didn't win that, so the court then went to the next step, heard evidence, awarded the damages that he thought was appropriate based on the evidence. But the point is, we had a bona fide legitimate defense. And the law is, we cited a couple of cases on page six of our brief. The law is that a bona fide dispute concerning coverage, I'm sorry, where there's a bona fide dispute concerning coverage, an award of costs and sanctions is inappropriate. The other case we cite says late notice of a claim raises a legitimate coverage question. Okay, we had a good fight, good argument, we lost. Okay, but we were not vexatious or unreasonable. In the judgment of Judge Zappa, which is not to be disturbed unless that's an abuse of discretion. And finally, pre-judgment interest. Our policy says, let me back up. The standard of review for pre-judgment interest, as supported by the case we cite on page eight of our brief, is manifest belated evidence. Another occasion for consideration of standard of review. But our policy says that no amount becomes due until 30 days after our liability and the extent of loss or damage has been definitely fixed. That didn't happen until a year ago when Judge Zappa entered his judgment order. Prior to that, no money was due. So there can be no entitlement to pre-judgment interest on the theory of money due under a written contract. It wasn't due. And we cite some authorities for that as well. Thank you very much for your time. You may not need to ask me, because I'm sure if you had questions you would have let me know. But before I sit down, if you do, thank you very much. Thank you, counsel. Mr. Young? Very briefly, just a couple points. One of them, the suggestion that the additional options under paragraph six somehow suggests that there's a whole planet of other remedies that can be brought in from somewhere, really isn't appropriate if you look at the contract itself. Because we start out with paragraph four, which says you defend or prosecute. You jump in. And it's acknowledged that Mr. Lesniak knew very early on he was their agent. They acknowledged him as their agent at the trial. So those options are additional options to those of the duties of the insurer to jump in and take care of the problem that they had insured. The suggestion that Mr. Pettigrew could just sit back and be unreasonable, well, his testimony was that what was really unreasonable was that he was limited by the $160,000. His damages were much greater than that. He just sought to testify that by any calculation you could very easily and quickly jump to show that his damages were far exceeding the amount of the policy. Thirdly, if it had been a true coverage issue, they could have come in on a DEC action. And I acknowledge that DEC declaratory judgment actions, obviously, usually you don't get an award for attorney's fees. But to sit back and do nothing is quite different than coming in and asking the court for a declaratory judgment on whether or not there is coverage or not. And finally, under the prejudgment interest, under the Ervin and Sears case, we cited that a policy of insurance is a written instrument for purposes of the award of 5% interest. Thank you. Thank you, counsel. We'll take the matter under advice.